**Bjorn J. GRUENWALD, Appellant,**

v.

**ADVANCED COMPUTER APPLICATIONS, INC., Adolf F. Weiss, Alpha Press, Inc., and Robert C. Whitley, III, Appellee.**

Superior Court of Pennsylvania.

Argued March 24, 1999.

Filed May 19, 1999.

**1006**

Jeffrey L. Eichen, Doylestown, for appellant.

Robert G. Bauer, Philadelphia, for Advanced Computer Applications, appellee.

Before ORIE MELVIN, SCHILLER and MONTEMURO*, JJ.

MONTEMURO, J.:

¶ 1 This is an appeal from the September 18, 1998 Order of the Bucks County Court of Common Pleas granting partial summary judgment in favor of Appellees/Defendants on Appellant's claims of breach of contract, misappropriation of trade secrets, and fraud.[1] For the reasons set forth below, we affirm.

¶ 2 The underlying suit arose from a business relationship gone sour. In December 1982, Bjorn Gruenwald and Adolf Weiss, formed Advanced Computer Applications, Inc. ("ACA"), for the development of computer technology and applications. Prior to that time, Gruenwald was President, and both he and Weiss were shareholders, of a New Jersey company carrying the same name ("ACA–NJ"). In addition, during the 1980's Gruenwald was employed as an independent contractor for Alpha Press, Inc. ("Alpha"), of which Weiss is the President, and since 1987, sole shareholder.

¶ 3 When ACA was formed, it acquired all the stock and assets of ACA–NJ, which operated as a wholly owned subsidiary until it ultimately dissolved. In addition, Alpha granted ACA a license to use Poly-FORTH II software, a computer language Gruenwald relied on while working at Alpha. Initially, Gruenwald was issued 860,-000 shares of ACA stock, and Weiss was issued 125,000 shares. On June 28, 1993, ACA sold 475,000 shares in a private offering; a group of five investors, led by Paul Matzko ("the Matzko group") purchased 400,000 shares, while Weiss purchased an additional 75,000 shares. Thereafter, Gruenwald was the controlling shareholder with 59% of ACA stock.

¶ 4 Gruenwald was elected and remained President of ACA's Board of Directors from 1983 through 1992. Additionally, from 1986 until 1993, both Weiss and Matzko served as directors. From 1986 through 1990, Weiss and Alpha loaned in excess of $500,000 to ACA, which was secured by a perfected security interest in all of ACA's assets.

¶ 5 ACA's initial focus was on the development of computer hardware and software for its customers in the control process and shop floor control industry. Shortly after its inception, ACA developed a computer language, ACA/L, which it

---

* Retired Justice assigned to Superior Court.

1. On August 19, 1998, the trial court granted summary judgment in favor of Appellees on seven of the eight counts contained in Appellant's complaint. Because that order was not immediately appealable as it did not "dispose of all claims and of all parties," Pa.R.A.P. 341(b)(1), Appellant petitioned for a determination of finality pursuant to Pa.R.A.P. 341(c). The court's September 18th Amended Order reflects its determination that "an immediate appeal would facilitate the resolution of the entire case." (Amended Order, dated September 18, 1998). Therefore, this appeal is proper.

used in its shop floor control business, its primary customer being DuPont. Each customer entered into a use license agreement with ACA for its use of ACA/L.

¶ 6 During this time, Gruenwald was also developing a more theoretical approach to computer systems solutions and structures called Nested Cellular Expansion or "NCE." In 1990, ACA applied for the trademark NCE.

¶ 7 During an October 1990 Board of Directors meeting, Gruenwald proposed that ACA retain his personal attorney, Joseph Hennesey, as a business advisor to ACA and/or elect him to the Board. The Board ultimately accepted the proposal and awarded Hennessey 100,000 shares of ACA stock. Shortly thereafter, Hennessey suggested that the company immediately improve its balance sheet by converting some of its substantial debt, including nearly $800,000 owed to Weiss and Alpha alone, into equity. Because he was concerned that the conversion would result in the dilution of his majority, Gruenwald purchased an additional 750,000 shares of stock from Alpha for $225,000 so that he would remain the largest single shareholder of ACA.[2]

¶ 8 ACA's prospects changed dramatically in June of 1992, when DuPont cancelled an order for shop floor technology resulting in the loss of approximately one million dollars in projected revenue. The company's immediate cash flow crisis prompted Gruenwald to call a special shareholder's meeting for July 18, 1992. At that meeting, Gruenwald reported that the company needed $100,000 immediately, and $400,000 before the end of the year to avoid insolvency. Weiss agreed to advance the necessary funds on the condition that he become the majority shareholder. The minutes of the meeting reflect that the shareholders unanimously approved a plan whereby each would sell Weiss a prorated portion of their respective shares at one cent per share for an aggregate total of 1,250,000 shares; in turn, Weiss prom-

ised to advance ACA $400,000. On July 22, 1992, Gruenwald sent a letter to Weiss confirming his intention to sell Weiss/Alpha 465,000 shares of his ACA stock for one cent per share in exchange for Weiss's advance of $400,000 to ACA.

¶ 9 Although Weiss fulfilled his promise and advanced the necessary funds, the Board of Directors and staff agreed that ACA needed to change its direction and implement programs targeted to the enterprise management telecommunications market. At the October 31, 1992 Board meeting, the Directors determined that a staff reorganization was necessary. Therefore, Weiss was elected Chairman, CEO and President, while Gruenwald was elected Vice Chairman and Chief Scientist so that he could devote all of his efforts toward the company's technological development.

¶ 10 The financial condition of the company worsened in 1993 and Gruenwald began doing much of his work from home. In November of that year, the Board asked him to submit a report detailing his recent projects. Gruenwald responded by submitting a proposal for a new project that would cost the company $3 million to implement, and require the hiring of additional staff. He stated in his proposal:

> I am not submitting this proposal in my capacity as an employee, agent, consultant, officer or director of the company. This is something I have thought of independent of my work at the company, and will be prepared under the proper circumstances to offer it to the company.

(Defendants' Motion for Summary Judgment, Exhibit EE, ACA Interoffice Memorandum at 3). Weiss, Matzko, and ACA's professional staff met to discuss this proposal. As a result of that meeting, they decided to terminate Gruenwald effective November 23, 1993. He subsequently resigned from the Board of Directors on December 3, 1993.

2. Gruenwald financed the purchase through a personal loan.

¶ 11 Gruenwald instituted suit against Weiss, Alpha and ACA on July 5, 1994.[3] In his Second Amended Complaint, Gruenwald alleges two counts of breach of an oral employment contract (Count I and III); two counts of fraud relating to the breach of contract issues (Counts II and IV); and one count each of fraudulent procurement of trade secrets (Count V), misappropriation of trade secrets (Counts VII), tortious destruction of stock value (Count VIII), and wrongful withholding of compensation (Count VI). On April 3, 1998, Appellees filed a motion for partial summary judgment on seven of Gruenwald's eight counts, which the trial court granted on August 19, 1998.[4] Gruenwald petitioned for a determination of finality so that the order would be immediately appealable. On September 18, 1998, the trial court vacated its 8/19/98 Order and entered an Amended Order which again granted Appellees' motion for summary judgment, and determined that "an immediate appeal would facilitate the resolution of the entire case." (Amended Order, dated September 18, 1998). This timely appeal follows.

Gruenwald raises the following five issues for our review:

A. In its decision to grant the motion for summary judgment, did the trial court improperly rely upon unsworn and uncertified documents attached to the moving party's papers?

B. Did the trial court improperly rely upon evidence submitted by the moving party which is directly contradicted by the evidence submitted by the nonmoving party?

C. Did the trial court apply the correct legal standard to decide whether there is sufficient evidence to support a claim for breach of contract?

D. Did the trial court apply the correct legal standard to decide whether there is sufficient evidence to support a claim for fraud?

E. Did the trial court apply the correct legal standard to decide whether there is sufficient evidence to support a claim for misappropriation of trade secrets? [5]

(Appellant's Brief at 2). Finding no error, we affirm.[6]

■■■ ¶ 12 Pursuant to Pennsylvania Rule of Civil Procedure 1035.2, a party may move for summary judgment in two circumstances:

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2(1), (2). Our review of an order granting summary judgment is ple-

---

**3.** The original and first amended complaints also included claims against attorney Robert Whitley alleging a conflict of representation, as he represented both Gruenwald and Weiss, and aiding and abetting the alleged fraud perpetrated by Weiss, Alpha, and ACA. However, he was not a named defendant in the Second Amended Complaint, and the issues on appeal relate solely to claims against Weiss, Alpha, and ACA.

**4.** Count VI, alleging that ACA wrongfully withheld Gruenwald's salary, was not included in Appellees' motion for summary judg-

ment, and, therefore, remains a viable issue for trial.

**5.** Gruenwald does not distinguish between his claims for fraudulent procurement of trade secrets and misappropriation of trade secrets, arguing both under the latter theory of recovery.

**6.** We note that Gruenwald has not challenged the court's grant of summary judgment with respect to his claim of tortious destruction of stock value.

nary. *Payton v. Pennsylvania Sling Co.*, 710 A.2d 1221, 1224 (Pa.Super.1998). "That is, we must review the record in the light most favorable to the adverse party and determine whether the moving party has established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Id.* It is the nonmoving party's responsibility to demonstrate that a genuine issue of material fact exists, *Johnson v. Harris*, 419 Pa.Super. 541, 615 A.2d 771, 775 (1992); "[a] witnesses' [sic] credibility is a determination for the jury and necessarily creates a genuine issue of material fact." *White v. Owens–Corning Fiberglas, Corp.*, 447 Pa.Super. 5, 668 A.2d 136, 142 (1995), *appeal denied,* 546 Pa. 648, 683 A.2d 885 (1996).

■ ¶ 13 Gruenwald's first two issues challenge the evidence relied on by the trial court in determining Appellees' motion for summary judgment. First, Gruenwald argues that the court improperly relied on unsworn exhibits attached to Appellees' motion. Although it is true that the exhibits attached to Appellees' motion are not supported by affidavit attesting to their accuracy, *see* Pa.R.Civ.P. 1035.4, Gruenwald failed to raise this issue before the trial court; therefore, it is now waived. Pa.R.A.P. 301(a)("Issues not raised in lower court are waived and cannot be raised for first time on appeal."). *See Staiano v. Johns Manville Corp.*, 304 Pa.Super. 280, 450 A.2d 681 (1982)(finding that, although documents attached to summary judgment motion should have been sworn exhibits, appellants failed to object before trial court; therefore, issue waived on appeal). *Cf. Wheeler v. Johns–Manville Corp.*, 342 Pa.Super. 473, 493 A.2d 120 (1985)(finding trial court erred in considering unsworn exhibits attached to summary judgment motion when appellant objected to inclusion of documents in response to summary judgment filed before trial court).

■ ¶ 14 Next, Gruenwald argues that the trial court improperly relied upon evidence submitted by Appellees which is contradicted by his own affidavit. Pursuant to the rule set forth in *Nanty–Glo Borough v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932), a party moving for summary judgment may not rely "exclusively upon oral testimony, either through testimonial affidavits or deposition testimony, to establish the absence of a genuine issue of material fact." *Porterfield v. Trustees of Hosp. of Univ. of Pa.*, 441 Pa.Super. 529, 657 A.2d 1293, 1295 (1995). However, the nonmoving party may respond to the motion by relying solely on an affidavit to create a genuine issue of material fact, i.e., a credibility determination for the jury. *See White, supra; Accu–Weather v. Prospect Communications*, 435 Pa.Super. 93, 644 A.2d 1251, 1255–56 (1994)(reversing order granting summary judgment because affidavits submitted by both parties conflict as to whether appellee gave appellant adequate notice of termination); *Johnson*, 615 A.2d at 775 (stating that a party responding to a motion for summary judgment may not rest on pleadings; "[r]ather, it is his responsibility to show that a genuine issue of fact exists by affidavit or otherwise."). Therefore, to the extent that Gruenwald argues that his affidavit is an appropriate response to Appellees' summary judgment motion, we agree.[7] We note, however, that a trial court may disregard an affidavit when it is not "wholly credible." *Lucera v. Johns–Manville Corp.*, 354 Pa.Super. 520, 512 A.2d 661, 666 (1986).

■ ¶ 15 Gruenwald's next three issues concern the trial court's rejection of his claims of breach of contract, misappropriation of trade secrets, and fraud. The trial court granted summary judgment because it found that Gruenwald "failed to carry his evidentiary burden." (Trial Ct. Op. at 11). Therefore, it appears that the

7. Gruenwald lists eight findings of fact of the trial court which he asserts are contradicted by his own affidavit. As these findings relate directly to Gruenwald's next three substantive issues, we will address them at the appropriate time.

court relied on subsection (2) of Rule 1035.2: "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action … which … would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(2).[8]

¶ 16 Gruenwald's response to Appellees' motion for summary judgment is supported by his personal affidavit, a portion of his deposition testimony, and a handwritten note, signed by Weiss, which he claims sets forth part of his agreement with Weiss.[9] Gruenwald alleges that in February, 1983, he and Weiss, acting on behalf of himself, Alpha, and ACA, reached an oral contract concerning Gruenwald's future with ACA. Specifically, Gruenwald contends that Weiss made the following promises: (1) Gruenwald would continue to be employed as a leader and President of ACA "as long as [he] was able to carry out the duties of President of the corporation[;]" (2) Weiss and Alpha would use their voting rights as shareholders to support Gruenwald; and (3) Weiss and Alpha would continue to support the company financially. (Affidavit of Bjorn Gruenwald, dated 5/6/98, at ¶ 3(a)–(d)).

¶ 17 In exchange for Weiss's promises, Gruenwald claims that he pledged to: (1) continue as President and "lead ACA in both its business operations and in its technology and inventions[;]" (2) vote his shares in support of Weiss's proposals; (3) continue to work for Alpha; (4) grant Weiss, Alpha, and ACA a license to use his trade secrets and inventions; and (5) provide Weiss and Alpha 125,000 shares of ACA stock at $.53 per share. (*Id.* at ¶ 4(a)–(f)). Gruenwald testifies in his affidavit that he and Weiss reaffirmed these promises many times during his 10 year

tenure with ACA. In addition, contrary to the minutes from the October 31, 1992 Board of Directors Meeting, Gruenwald claims that he did not agree to his demotion to "Chief Scientist." He argues that these facts, which he attests to in an affidavit, raise a genuine issue of material fact precluding summary judgment.[10]

¶ 18 According to well-established Pennsylvania law, employment agreements are presumptively terminable at will by either party. *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192, 1196, , *appeal denied,* 517 Pa. 607, 536 A.2d 1331 (1987). "The party claiming that an agreement is for a definite period has the burden of proving that fact … [by providing] clear proof that the parties contracted for a specific duration." *Id.* A promise of "permanent" or "lifetime" employment is generally insufficient to rebut the presumption of at will employment. *Id. Accord Scott v. Extracorporeal, Inc.*, 376 Pa.Super. 90, 545 A.2d 334, 337 (1988).

> A contract for life is a heavy burden to impose upon an employer. Courts should be careful that when such a burden is imposed it is because that is what was contracted for and not because the jury was impassioned and sought to wreak vengeance. This danger is one of the reasons courts refuse to enforce such a contract if the only proof of its existence is that the parties exchanged promises. The parties may have used the word "permanently" or "for life" in an off-hand manner. These words are much too ambiguous to provide the sole basis for a jury's imposition of such a tremendous obligation. Courts must look to the surrounding circumstances to determine the parties['] intent.

*See* Memorandum in Opposition to Defendants' Motion for Summary Judgment, Exh. A at 7.

---

**8.** We remind Gruenwald, however, that we may affirm a lower court's decision on any basis. *Boyer v. Walker*, 714 A.2d 458, 463 n. 10 (1998).

**9.** The note appears to consist of actually two notes, each in different handwriting, one of which is unsigned and not dated, the other of which is signed by Weiss and dated 2/18/83.

**10.** Neither note attached to his summary judgment response sets forth any of these alleged promises.

\* \* \*

Only when those circumstances demonstrate the parties' intent by clear evidence should a court enforce a lifetime employment contract. The presence of additional consideration is only a single factor, albeit an important one, which a court must consider to ascertain the intent.

*Greene*, 526 A.2d at 1198, 1202.

¶ 19 In *Greene*, *supra*, the appellant alleged that he worked for the appellee/company at sub-union wages for 24 years in exchange for appellee's promise of lifetime employment; this Court found that the circumstances surrounding the promise raised a genuine issue of material fact for the jury. *Id.* at 1202. Similarly, in *Marsh v. Boyle*, 366 Pa.Super. 1, 530 A.2d 491 (1987), we concluded that although the appellant's allegation that he was promised employment for at least two years was "not sufficiently definite" itself to raise a jury question, the appellant's further claim that the circumstances surrounding this promise, i.e., that in reliance he resigned from his former job, put his house up for sale, and moved to another city, provided sufficient additional consideration to raise a genuine issue of material fact.[11] *Id.* at 494.

■ ¶ 20 In the present case, Gruenwald argues, without elaboration, that "there is more than sufficient evidence, contained in [his] affidavit ... and in his deposition testimony, for a jury to conclude that an oral contract did exist between Mr. Gruenwald and Mr. Weiss, ACA and Alpha Press." (Appellant's Brief at 23). We disagree. Accepting Gruenwald's affidavit as true, Weiss's promise of employment was far too indefinite to support a lifetime contract. *See Marsh, supra; Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571, 578 (1986), *appeal denied*, 532 Pa. 665, 616 A.2d 986 (1992)("[B]ecause of its vitality, courts insist that to contract-away the at-will presumption, much clarity

is required."). Gruenwald claims Weiss promised to employ him "for as long as I am able to carry out the duties of President of the corporation." (Affidavit of Bjorn Gruenwald, dated 5/6/98, at ¶ 3(a)). Indeed, Gruenwald worked for ACA for 10 years.

¶ 21 Moreover, the circumstances surrounding the alleged promise do not support Gruenwald's contentions. Significantly, at the time Gruenwald claims the promises were made, he was the majority shareholder and President of ACA. Therefore, we fail to see how Weiss, a minority shareholder, could bind ACA through a promise to Gruenwald for lifetime employment. Moreover, Gruenwald's claim that in exchange for lifetime employment, he permitted Weiss and Alpha to purchase 125,000 shares of ACA stock at $.53 per share is illusory as the Matzko group also purchased their ACA stock that same year for $.53 per share. Each time Weiss and/or Alpha advanced funds to ACA, they received additional consideration such as stock or a security interest in ACA's property.

¶ 22 Gruenwald's allegation of breach of this employment contract involves two specific incidents: (1) Gruenwald's purchase of 750,000 shares of stock from Alpha in 1991 at $.30 per share; and (2) Gruenwald's sale of 465,000 shares to Weiss in 1992 at $.01 per share. He claims that he agreed to the 1991 purchase and the 1992 subsequent sale based on the promises made to him by Weiss. Again, however, the circumstances involving these transactions belies Gruenwald's contentions. It is clear that Gruenwald's 1991 purchase of 750,000 shares of stock from Alpha was necessary to maintain his status as majority stockholder. Indeed, the price Gruenwald paid for the stock was equal to the conversion price ACA utilized to convert $450,000 of debt owed to Alpha and Weiss into 1,500,000 shares of ACA stock. Moreover, the minutes of the July 18, 1992

---

**11.** The appellee/employer fired the appellant after only two months.

stockholders' meeting reflect that, with the exception of employee shareholders, all individual shareholders unanimously agreed to sell an aggregate of 1,250,000 shares of stock to Weiss and Alpha at $.01 per share in exchange for Weiss's promise to advance $400,000 to the company. Indeed, Gruenwald acknowledged his acceptance of this proposal in a letter dated July 22, 1992. *See* Defendants' Motion for Summary Judgment, Exh. U, Gruenwald letter to Weiss.

 ¶ 23 Finally, Gruenwald's assertion that Appellees breached the contract when he was demoted to Vice President and Chief Scientist during the October 31, 1992 Board Meeting is again belied by the record. The minutes from the meeting clearly state that the Board unanimously agreed to the reorganization "which would enable Bjorn Gruenwald to devote all of his efforts toward visionary technology development which would be required in the future." (Defendants' Motion for Summary Judgment, Exh. AA, Minutes of 10/31/92 ACA Board of Directors Meeting at 2). Although Gruenwald now claims that the minutes are incorrect and he never agreed to the demotion, he failed to follow proper corporate procedure and note his dissent.

> A director of a business corporation who is present at a meeting of its board of directors, ... at which action on any corporate matter is taken on which the director is generally competent to act, **shall be presumed to have assented to the action taken unless his dissent is entered in the minutes of the meeting or unless he files his written dissent to the action with the secretary of the meeting before adjournment thereof or transmits the dissent in writing to the secretary of the corporation immediately after the adjournment of the meeting.** The right to dissent shall

not apply to a director who voted in favor of the action. **Nothing in this subchapter shall bar a director from asserting that minutes of the meeting incorrectly omitted his dissent if, promptly upon receipt of a copy of such minutes, he notifies the secretary in writing of the asserted omission or inaccuracy.**

(15 Pa.C.S.A. § 1714)(emphasis added). Gruenwald does not claim that he did not receive a copy of the minutes; he simply argues that the secretary is a friend of Weiss and recorded his vote incorrectly. *See* Affidavit of Bjorn Gruenwald, dated 5/6/98 at ¶ 10. However, Gruenwald has failed to attach a written dissent or a letter requesting a correction in the minutes; thus, no reasonable juror could conclude that Gruenwald did not assent to his demotion. Therefore, we agree with the trial court that Gruenwald has failed to provide sufficient evidence of the existence of a lifetime employment contract with ACA.

 ¶ 24 Next, Gruenwald alleges that ACA, Weiss and Alpha misappropriated his trade secrets, specifically the NCE technology and the ACA/L computer language.[12] Generally, this type of claim involves a former employee who acquires the trade secrets of his former employer and utilizes them to the employer's disadvantage after leaving the company. Thus, to be entitled to relief, a plaintiff must show:

> (1) that there was a trade secret ...; (2) that it was of value to employer [owner] and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the employee while he was in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to dis-

12. Although Gruenwald attached to his Response to the Motion for Summary Judgment a list of 15 trade secrets that he claims ACA misappropriated after his termination, the allegations in his Second Amended Complaint refer only to the NCE technology and the ACA/L language. Therefore, we will restrict our discussion to those technologies.

close it to others, or to make use of it himself, to the prejudice of his employer. *West Mountain Poultry Co. v. Gress,* 309 Pa.Super. 361, 455 A.2d 651, 653 (1982)(quoting *Macbeth–Evans Glass Co. v. Schnelbach,* 239 Pa. 76, 87, 86 A. 688, 691 (1913)). In the present case, however, Gruenwald, the former employee, alleges that he retained "ownership" of the technologies he created at ACA; thus, ACA's use of the NCE technology and ACA/L computer language after his termination is a misappropriation of his trade secrets. Gruenwald supports his claim by attesting in his affidavit that

> I agreed that, for as long as Adolph Weiss, Alpha Press and ACA continued to live up to their side of our agreement, I would grant them a license to use the trade secrets and inventions which I had personally developed or directed the development of, including all of the trade secrets and inventions which I developed or directed the development of while working at ACA and Alpha Press.

(Affidavit of Bjorn Gruenwald, dated 5/6/98 at ¶ 4(e)). He further alleges that "[a]s we had previously agreed, these trade secrets and inventions were always my property and were only licensed to Adolph Weiss, ACA and Alpha Press as part of our agreement." (*Id.* at ¶ 12). However, Gruenwald's unsupported assertion that he is the "owner" of the NCE technology and ACA/L is belied by the record.

¶ 25 First, Gruenwald fails to acknowledge that he was both a director and employee of the corporation at the time this alleged agreement was made. As a director, he owed a fiduciary duty to the corporation to perform his duties "in a manner he reasonably believes to be in the best interests of the corporation[.]" 15 Pa.C.S.A. § 1712(a). By reserving ownership of his "inventions" rather than assigning them to the corporation, he certainly was not operating in the company's best interest. Moreover, "absent an express contrary agreement, an employee must assign his invention to his employer if he was

hired for the purpose of using his inventive ability to solve a specific problem or to design a certain procedure or device for the employer; in such a case, the invention is the precise subject of the employment contract." *Aetna–Standard Engineering Co. v. Rowland,* 343 Pa.Super. 64, 493 A.2d 1375, 1378 (1985). Gruenwald has produced no patents issued to him for the NCE technology or the ACA/L language, nor has he produced a written licensing agreement permitting ACA to use these technologies as long as he was employed by ACA. *See Id.* at 1379 (stating that although employer may not be entitled to assignment of employee's **patented** invention, "[a] shop right will arise ... where the employee devises the invention on the employer's time and at the latter's expense, using his materials and facilities, and allows him to use the invention without special consideration.").

¶ 26 However, Appellees have provided extensive documentation disproving Gruenwald's claim. With regard to the ACA/L computer language, Gruenwald signed a licensing agreement, on behalf of ACA, permitting one of its customers to use "the ACA computer programs which compose the ACA/L operating system and utility programs, manuals, and documentation[.]" (Defendants' Motion for Summary Judgment, Exh. E, ACA License Agreement at 1). Moreover, in a July 1991 letter to the ACA shareholders, Gurenwald referred to ACA/L as "[o]ur language." (*Id.* at Exh. I, ACA letter to Shareholders). With respect to the NCE technology, Gruenwald registered the trademark "Nested Cellular Expansion NCE" *on behalf of ACA* on September 6, 1990. *See Id.* at Exh. G, Trademark Application. In addition, he referred to NCE as "ACA's core parallel processing technology" in an internal memo he sent to Weiss and Matzko. (*Id.* at Exh. OO, ACA Interoffice Memorandum at 1)(emphasis added). Therefore, Gruenwald's bald allegation of an oral licensing agreement is belied by his subsequent conduct; he represented to

both ACA's customers and shareholders that NCE and ACA/L were owned by ACA. We agree with the trial court that "the evidence reveals that any protectable trade secrets belong to ACA." (Trial Ct. Op. at 19). Accordingly, Gruenwald is entitled to no relief.

 ¶ 27 Lastly, Gruenwald contends that the trial court erred in granting summary judgment on his claims of fraud. To prove fraud, a plaintiff must demonstrate:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994)(citing W. Page Keaton, *Prosser and Keaton on the Law of Torts* § 105 (5th ed.1984)). Gruenwald's fraud claim is premised on his allegation of breach of contract. As we have found he has not provided sufficient proof of an employment contract, his fraud claim fails. Moreover, Gruenwald's only proof of fraud is his bald allegation:

> Based upon Mr. Weiss's subsequent breach of our agreement and claim that no agreement ever existed between us, **I believe that Mr. Weiss's statements to me were false at the time that he was making them, that Mr. Weiss knew of their falsity, knew that I would rely upon them and intended for me to rely upon them.**

(Affidavit of Bjorn Gruenwald at ¶ 6)(emphasis added). Gruenwald's "belief," in and of itself, is simply insufficient to prove a claim of fraud. *See McCain v. Pennbank,* 379 Pa.Super. 313, 549 A.2d 1311, 1313–14 (1988)("Bold unsupported assertions of conclusory accusations cannot create genuine issues of material fact.").

¶ 28 Therefore, because we find the trial court properly granted summary judgment, we affirm.

¶ 29 Order affirmed. Case remanded for further proceedings with regard to Count VI of the Complaint. *See* n. 4, *supra.* Jurisdiction relinquished.